The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
July 8, 2021

## 2021COA93

**No. 19CA1948, *People in Interest of K.S-E.* — Constitutional Law — Fifth Amendment — Right Against Self-Incrimination**

A division of the court of appeals concludes, as a matter of first impression, that the Fifth Amendment guarantees a testifying witness the contemporaneous advice of counsel — on a question-by-question basis — in determining whether to invoke the privilege against self-incrimination. The division further concludes that the violation of a court order unlawfully prohibiting such advice could not sustain a finding of contempt where compliance with the order carried a substantial risk of irreparable harm.

Court of Appeals No. 19CA1948
Arapahoe County District Court No. 18JV969
Honorable Natalie T. Chase, Judge
Honorable Sheila A. Rappaport, Judge

The People of the State of Colorado,

Appellee,

In the Interest of K.S-E., a Child,

and Concerning Alan Rosenfeld,

Attorney-Appellant.

ORDER VACATED

Division III
Opinion by JUDGE TAUBMAN*
Furman and Gomez, JJ., concur

Announced July 8, 2021

Philip J. Weiser, Attorney General, Leeann Morrill, First Assistant Attorney General, Denver, Colorado, for Appellee

Kilmer, Lane & Newman, LLP, David A. Lane, Liana Gerstle Orshan, Denver, Colorado, for Attorney-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2020.

¶ 1 Alan Rosenfeld, an attorney licensed to practice law in Colorado, appeals the district court's order holding him in direct contempt for conduct during his representation of S.S. (mother) in a dependency and neglect proceeding.

¶ 2 To resolve this appeal, we must examine the lawfulness of a court order implicating mother's Fifth Amendment rights, the violation of which gave rise to Rosenfeld's contempt citation. Specifically, we are asked to determine, as a matter of first impression, whether the court could lawfully prohibit Rosenfeld from contemporaneously advising mother, on a question-by-question basis, to invoke her privilege against self-incrimination as she was testifying. Because we conclude that the Fifth Amendment's concomitant right to advice of counsel encompasses contemporaneous advice, we conclude that Rosenfeld was entitled to advise mother about her Fifth Amendment rights on a question-by-question basis.

¶ 3 Moreover, applying the exception from *Maness v. Meyers*, 419 U.S. 449 (1975), for the first time in Colorado, we conclude that the risk of irreparable harm from the court's unlawful order was sufficient to excuse Rosenfeld's noncompliance. Accordingly, we

1

vacate the district court's order holding Rosenfeld in direct contempt and its imposition of punitive sanctions.

## I.  Background

¶ 4    Mother retained Rosenfeld to represent her in Arapahoe County District Court Case No. 18JV969, a dependency and neglect proceeding involving her child, K.S-E.

¶ 5    On January 24, 2019, before trial, the People and the guardian ad litem (GAL) appointed to represent K.S-E.'s interests filed a joint motion seeking the appointment of a GAL to represent mother's interests.  As grounds therefor, they alleged that mother was not competent to understand the proceedings.  Mother opposed the motion.

¶ 6    On January 31, 2019, the district court judge, Judge Natalie Chase, conducted a pretrial readiness conference with the parties and counsel.  That same day, Rosenfeld filed a motion in limine to exclude "any mention in front of the jury in this matter of pending criminal charges against the mother," which arose from an incident in which mother allegedly kidnapped K.S-E.

¶ 7    At the pretrial conference, the district court addressed the joint motion to appoint a GAL to represent mother's interests, for

which it decided to conduct and on-the-spot "*Sorensen*-type hearing."[1] The People called mother as a witness. Before beginning direct examination, the People informed the court that mother "has a pending criminal action that's attendant to these proceedings and the factual allegations overlap" and asked that she be advised about her Fifth Amendment rights. The court agreed and gave a "full advisement" to mother.

¶ 8 Following the advisement, the People and the child's GAL asserted that Rosenfeld should not be allowed to "stand up and invoke [the Fifth Amendment] on [mother's] behalf." Rosenfeld responded that "I will stand up and advise her to invoke," to which the court responded, "No" and "I don't think you get to do that."

¶ 9 The People then began direct examination, during which the following exchanges occurred:

---

[1] The court appears to have been referencing *In re Marriage of Sorensen,* 166 P.3d 254 (Colo. App. 2007). There, a division of this court held that, in a dissolution of marriage action, where "a factual question clearly existed whether wife was competent and could adequately direct counsel or otherwise understand the nature of the proceedings," "an evidentiary hearing [was] required to determine whether wife met the standard under *People in Interest of M.M.*[, 726 P.2d 1108, 1120 (Colo. 1986),] and, thus, whether she needed a guardian ad litem to act as her fiduciary." *Sorensen,* 166 P.3d at 258.

[The People]: So why did you run with [K.S-E.]?

[Rosenfeld]: Objection. I will advise her to —

[The Court]: Sit down.

[Rosenfeld]: — (indiscernible) Fifth Amendment right.

[The Court]: You — I already told you you don't get to do that. She makes the determination.

[Rosenfeld]: And I get to advise her when it's appropriate. I will.

. . . .

[The People]: And what information did you have during that period that led you to believe that you needed to take her?

[Rosenfeld]: Objection, again. I'd advise my client to waive — to exercise her —

[The Court]: If you keep —

[Rosenfeld]: — Fifth Amendment right.

[The Court]: — doing this, I'm going to hold you in direct contempt. I — it is her voluntary decision.

[Mother]: I —

[Rosenfeld]: Your honor, you may — and I don't want — I'm not asking you to, but I understand what your — what your position is. But I have a responsibility to my client, and she has a right to be advised when there are questions.

4

[The Court]: You had the opportunity to advise her out in the hall about this. You don't get to interrupt during every question, period.

[Rosenfeld]: Only questions that implicate the Fifth Amendment, Your Honor.

[The Court]: Sir, you do not — you show me case law for a civil proceeding that you get to interrupt when you believe it's appropriate to tell her. I'm not aware of any. Do you have any? I'm speaking to you.

. . . .

[Rosenfeld]: Sure. I do not have the case law in front of me right now. But I am absolutely certain in my profession[al] [responsibility] and my obligation to — to give her that advice on a question-by-question basis.

. . . .

[The Court]: You had the opportunity to advise her out in the hall. Would you like another one?

[Rosenfeld]: Sure.

[The Court]: All right. You may advise her out in the hall, but that's it, period. Go ahead.

¶ 10   After a short recess, and before the People resumed their examination of mother, the court reiterated its order:

[The Court]: So, I'm going to go with the original, like, here's the deal though. You don't get to stand up and say, "I'm advising her to take the Fifth." She's been out — out in the

5

hall with you multiple times today. It will be her decision and it will be a voluntary decision if she's going to answer the question. Per question. Okay?

¶ 11 During the remainder of direct examination, mother invoked her Fifth Amendment privilege against self-incrimination in response to several questions without Rosenfeld verbally advising her to do so. After cross and redirect examination, but while mother was still on the witness stand, the court asked mother: "Did your counsel advise you out in the hall that he would knock on the table for you [to invoke your] Fifth Amendment right, to plead the Fifth." Rosenfeld objected on the basis of attorney-client privilege, and mother responded by stating "[a]ttorney-client privilege." The following exchange then occurred:

> [The Court]: So, Mr. Rosenfeld, why is that you have been knocking on the table every time she's pled the Fifth?
>
> . . . .
>
> [Rosenfeld]: Actually, Your Honor, there have been sometimes that I've knocked on the table and she hasn't pled the Fifth. So, I don't agree with your premise.
>
> [The Court]: So, you're going to say that every time that she pled the Fifth, you didn't knock? 'Cause I heard it.

[Rosenfeld]: Oh, no, that's just — that — that — that's a different question. I was saying that there have been — there have been times in this short proceeding when I either knocked or put my hand on the table and — and she did not plead the Fifth Amendment.

[The Court]: As an officer of the court, and you knew this court's orders with regards to the Fifth, did you instruct her that you would knock on the table as an advisement to plead the Fifth? Yes or no? It's simple. Yes or no?

[Rosenfeld]: Well, that directly implicates attorney-client communication. So, I don't believe I can answer that, Your Honor.

[The Court]: Okay. If you want me to go down that path, then I can hold you in contempt based on what I saw. Yes? No?

[Rosenfeld]: Are you asking me to —

[The Court]: I'm going to hold a negative inference on what you're saying to me right now. And I will hold you in — in direct contempt. Are we clear? It —

[Rosenfeld]: Yes, you're clear.

[The Court]: — a knocking is not communication. It is advising her when I directly told you you cannot do that, in a different form for each and every question. I directly told you that.

¶ 12    After another short recess, the court informed the parties that

"[w]e're going to proceed right now forthwith with direct contempt

7

whether it happened or not." The court characterized its earlier order as directing Rosenfeld "not to stand or give any communication to [mother] — on whether she was going to plead the Fifth or not." The court and Rosenfeld then had a lengthy discussion about whether his knocking violated the court's earlier order. Rosenfeld expressed some confusion as to the scope of the order, stating that he was under the impression he had only been ordered not to stand and object on Fifth Amendment grounds. However, he acknowledged that he was, "in a variety of forms, sometimes trying to get her attention . . . [and] [t]rying to protect her Fifth Amendment rights and advise her about whether or not the questions were potentially in violation of her Fifth Amendment [rights]."

¶ 13    Ultimately, the court found Rosenfeld in direct contempt for violating its order:

> She's on the witness stand. You don't get to
> tell her what to say or not to say. That's the
> whole point of why I issued the order. And if
> you had confusions as to the order, you should
> have addressed it instead of trying to be
> sneaky behind this Court's back, which is
> exactly what you just admitted to. You and
> your actions, this Court is finding is so
> extreme that this is absolutely something this

8

Court would never expect from any lawful attorney practicing law in this court or any other court. And that this Court warned you. And I don't even need to warn you now, you've admitted to it, that your conduct is so offensive to the authority and dignity of this Court that I have no choice but to find you in direct contempt. To think that just because I said no standing up — if that's what I really said — you don't get to advise her, you know the intent. You were trying to be sneaky behind this Court's back, but I caught on. And that's not okay.

¶ 14     When the hearing on the joint motion to appoint a GAL for mother resumed, the court noted, "I held Mr. Rosenfeld in direct contempt" and listed several concerns about allowing him to continue to represent mother. The court ultimately removed Rosenfeld as the attorney for mother and ordered him to appear on February 7, 2019, for sentencing on the direct contempt finding.

¶ 15     The day before the sentencing hearing, Rosenfeld filed a motion to reconsider the contempt finding on the ground that the court's order prohibiting him from contemporaneously advising his client was unlawful. He also requested that Judge Chase recuse herself from the contempt proceedings. Judge Chase continued the sentencing hearing to March 7, 2019, at which point she denied Rosenfeld's motion to reconsider her finding of direct contempt.

However, she recused herself from any further involvement, and the case was assigned to Judge Sheila Rappaport.

¶ 16    Rosenfeld then filed a motion to dismiss the contempt citation, largely raising the same arguments as in his earlier motion for reconsideration. At a hearing on July 30, 2019, Judge Rappaport denied the motion and set a sentencing hearing for October 3, 2019. At the October hearing, Judge Rappaport imposed a $1,000 fine against Rosenfeld, which she stayed pending exhaustion of Rosenfeld's appellate remedies.

¶ 17    Rosenfeld now appeals the court's order holding him in contempt and its imposition of punitive sanctions.

## II.    Standard of Review

¶ 18    "A finding of contempt is within the trial court's sound discretion and may not be reversed absent an abuse of that discretion." *People ex rel. State Eng'r v. Sease*, 2018 CO 91, ¶ 24, 429 P.3d 1205, 1211. A district court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair or is contrary to law. *Id.*; *Sos v. Roaring Fork Transp. Auth.*, 2017 COA 142, ¶ 48, ___ P.3d ___, ___. However, the lawfulness of a district court's order — the violation of which may give rise to a finding of

contempt — is subject to de novo review. *See Hartsel Springs Ranch of Colo., Inc. v. Cross Slash Ranch, LLC*, 179 P.3d 237, 239 (Colo. App. 2007) (In an appeal from a contempt citation, "we review the trial court's . . . legal conclusions de novo."); *White v. Adamek*, 907 P.2d 735, 737-38 (Colo. App. 1995) (reviewing de novo whether a district court's order, violated by the defendant, was lawful).

### III.   Applicable Law and Analysis

¶ 19    As an initial matter, we note that the parties espouse opposing views as to the scope of the court's order.  Rosenfeld construes the order as having prohibited him only from standing and objecting on Fifth Amendment grounds.  The district court, however, maintains on appeal that the order prohibited any attempt to advise mother to invoke her privilege against self-incrimination on a question-by-question basis.  Though Judge Chase later clarified that she intended the latter, the record indicates that her initial order did not expressly preclude Rosenfeld from knocking on the table or otherwise communicating with mother.

¶ 20    The lack of clarity in the court's order raises the question of whether it unambiguously prohibited Rosenfeld's conduct.  *See Hartsel Springs Ranch of Colo., Inc.*, 179 P.3d at 239 ("Generally,

there can be no contempt unless an order or decree requires a party to do, or refrain from doing, some specific act."). However, Rosenfeld only points out the order's potential ambiguity to suggest that punitive sanctions were improper because he did not willfully violate the order. *See In re Marriage of Cyr*, 186 P.3d 88, 92 (Colo. App. 2008) ("Punitive sanctions for contempt must be supported by findings of fact establishing beyond a reasonable doubt . . . the contemnor's willful refusal to comply with the order."). Because we do not reach the issue of whether Rosenfeld's alleged violation was willful, we do not address the potential ambiguity of the court's order. Accordingly, though the issue is not free from doubt, we will assume that the order was broad enough to prohibit Rosenfeld from contemporaneously advising mother on a question-by-question basis.

¶ 21    To the extent the court's order prohibited such conduct, Rosenfeld contends that the order was unlawful under the Fifth Amendment. He further contends that because compliance with the order carried a substantial risk of irreparable harm to mother, he was under no duty to comply. Thus, he argues, his violation of

the court's order could not sustain a finding of direct contempt. We agree.

### A. Contempt in General

¶ 22    "[T]he purpose[s] of the contempt power [are] to maintain the dignity and authority of the court and to preserve its functionality." *People v. Aleem*, 149 P.3d 765, 781 (Colo. 2007). Thus, "[a] court may hold a party in contempt for any conduct which interferes with the court's administration of justice, is derogatory to the dignity of the court, or tends to bring the judiciary into disrespect." *Id.* at 774. As relevant here, such conduct may include a party's failure to comply with a court order. *See* C.R.C.P. 107(a)(1) (defining contempt as including "disobedience . . . by any person to . . . any lawful . . . order of the court"); *see also Sease*, ¶ 37, 429 P.3d at 1213.

¶ 23    "Contempt proceedings are governed by C.R.C.P. 107." *Sease*, ¶ 21, 429 P.3d at 1210. The rule distinguishes between two types of contempt — direct and indirect. "Direct contempt," the type involved here, is contempt that "the court has seen or heard and is so extreme that no warning is necessary or that has been repeated despite the court's warning to desist." C.R.C.P. 107(a)(2). "Indirect

13

contempt" refers to contempt that "occurs out of the direct sight or hearing of the court." C.R.C.P. 107(a)(3).

¶ 24    Rule 107 vests the court with the authority to impose remedial or punitive sanctions on a contemptuous party for certain defined behavior. *See* C.R.C.P. 107(a)(4), (5); *Aleem*, 149 P.3d at 781 (Rule 107 "limits the court's contempt power by defining the type of behavior that courts may punish with contempt sanctions."). Punitive sanctions — the type imposed against Rosenfeld — "are criminal in nature and are designed to punish 'by unconditional fine, fixed sentence of imprisonment, or both, for conduct that is found to be offensive to the authority and dignity of the court.'" *In re Marriage of Cyr*, 186 P.3d at 91 (quoting C.R.C.P. 107(a)(4)).

B.    The Court's Order Was Unlawful Under the Fifth Amendment

¶ 25    Because, as discussed below, a party may be excused from compliance with an unlawful order in exceptional circumstances, we begin by considering Rosenfeld's contention that the court's order was unlawful under the Fifth Amendment.

¶ 26    The Fifth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, guarantees that no person "shall be compelled in any criminal case

to be a witness against himself." U.S. Const. amend. V; *see People v. Ruch*, 2016 CO 35, ¶ 20, 379 P.3d 309, 313. Thus, "[t]he Fifth Amendment provides a witness with a privilege to decline to answer questions if the answers would incriminate him or her" in future criminal proceedings. *People v. Smith*, 275 P.3d 715, 720 (Colo. App. 2011); *accord Ruch*, ¶ 20, 379 P.3d at 313. The privilege against self-incrimination "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory." *Kastigar v. United States*, 406 U.S. 441, 444 (1972).

¶ 27    As relevant here, the United States Supreme Court has also recognized that the Fifth Amendment embraces a concomitant right to the advice of counsel distinct from that protected by the Sixth Amendment. *Maness*, 419 U.S. at 465-66.

¶ 28    In *Maness*, an attorney was held in contempt in a civil proceeding solely for advising his client to refuse, on Fifth Amendment grounds, to comply with a subpoena duces tecum that sought to compel the client to produce obscene magazines. *Id.* at 450-55. In reversing the district court's contempt citation, the Court observed that

> [t]he privilege against compelled self-incrimination would be drained of its meaning if counsel, being lawfully present, as here, could be penalized for advising his client in good faith to assert it. The assertion of a testimonial privilege, as of many other rights, often depends upon legal advice from someone who is trained and skilled in the subject matter, and who may offer a more objective opinion. A layman may not be aware of the precise scope, the nuances, and boundaries of his Fifth Amendment privilege. It is not a self-executing mechanism; it can be affirmatively waived, or lost by not asserting it in a timely fashion.

*Id.* at 465-66 (footnotes omitted).

¶ 29 Accordingly, the Court held that "an advocate is not subject to the penalty of contempt for advising his client, in good faith, to assert the Fifth Amendment privilege against self-incrimination in any proceeding embracing the power to compel testimony." *Id.* at 468. "To hold otherwise," it explained, "would deny the constitutional privilege against self-incrimination the means of its own implementation. When a witness is so advised the advice becomes an integral part of the protection accorded the witness by the Fifth Amendment." *Id.*

¶ 30 Thus, the Court acknowledged that the constitutional privilege against compulsory self-incrimination embraces a witness's right to

16

the advice of counsel in a civil proceeding. *See id.* at 470 (Stewart, J., concurring in the result) (so articulating the court's holding).

> The premise underlying the conclusion that the constitutional privilege against compulsory self-incrimination includes the right to the unfettered advice of counsel in civil proceedings must be that there is a constitutional right, also derived from the privilege against compulsory self-incrimination, to some advice of counsel concerning the privilege in the first place.

*Id.* at 471.

¶ 31    Accordingly, the Fifth Amendment includes a concomitant right to the advice of counsel in determining whether to assert one's privilege against self-incrimination. However, does that right guarantee a testifying witness the *contemporaneous* advice of counsel on a question-by-question basis? This question appears to be one of first impression in Colorado. Indeed, the *Maness* Court left largely undefined the scope of the right and how it operates as a matter of practical application. However, for the reasons discussed below, we answer this question in the affirmative.

¶ 32    It is well established that the privilege against self-incrimination "is an option of a refusal, not a prohibition of inquiry," and thus it "may not be asserted as a blanket claim in

17

advance of the questions actually propounded." *Ruch*, ¶ 23, 379 P.3d at 313 (quoting *People v. Austin*, 159 Colo. 445, 450, 412 P.2d 425, 427 (1966)). Rather, as the Colorado Supreme Court has recognized, "[t]he proper procedure" when invoking the privilege "is to wait until a question which tends to be incriminating has been asked and then decline to answer." *Austin*, 159 Colo. at 450, 412 P.2d at 427; *accord People in Interest of I.O.*, 713 P.2d 396, 397 (Colo. App. 1985). This is in part because the availability of the privilege turns on the nature of a particular question and the exposure that it invites. *See, e.g.*, *Rogers v. United States*, 340 U.S. 367, 373 (1951) (A witness "cannot invoke the privilege where response to the specific question in issue . . . would not further incriminate her."); *Wilson v. United States*, 558 A.2d 1135, 1141 (D.C. 1989) ("[A] witness may invoke the privilege only as to those specific questions to which his answers would incriminate him."), *overruled on other grounds by Carter v. United States*, 684 A.2d 331 (D.C. 1996).

¶ 33    Thus, the determination of whether to invoke the privilege must be made on a question-by-question basis. Yet, as the *Maness* Court explained, a witness cannot be expected to soundly make

18

such a determination absent the advice of counsel — accordingly, the right to such advice is subsumed within the Fifth Amendment. *See* 419 U.S. at 466 ("The assertion of a testimonial privilege . . . often depends upon legal advice from someone who is trained and skilled in the subject matter," as "[a] layman may not be aware of the precise scope, the nuances, and boundaries of his Fifth Amendment privilege."). In fact, where a witness has difficulty understanding the proceedings, some courts have gone so far as to suggest that a witness's attorney may interpose the privilege on the witness's behalf on each potentially incriminating question. *See People v. Macias*, 44 Colo. App. 203, 207, 616 P.2d 150, 153 (1980) (The district court did not abuse its discretion where "[t]he court observed that the witness had difficulty understanding the questions asked, and, rather than requiring her to decide whether the questions were self-incriminating, the court allowed her attorney to interpose the privilege for her."); *see also Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1019 (9th Cir. 2006) (stating in dicta that "[u]pon hearing a question put forth by the Government that he thought triggered the Fifth Amendment, Garcia-Quintero's attorney could have objected, or asked to consult

19

with his client") (footnote omitted), *overruled on other grounds by*
*Medina-Nunez v. Lynch*, 788 F.3d 1103 (9th Cir. 2015) (per curiam).

¶ 34    In sum, then, a witness has a Fifth Amendment right to the
advice of counsel in determining whether to invoke the privilege,
but any such determination must necessarily be question-specific.
Thus, it follows that the right must encompass a guarantee to
contemporaneous advice on a question-by-question basis.[2]  *See*
*Hoffman v. United States*, 341 U.S. 479, 486 (1951) (The Fifth
Amendment "must be accorded liberal construction in favor of the
right it was intended to secure.").  Because the district court's order
here prohibited Rosenfeld from contemporaneously advising his
client, we conclude that the order was unlawful under the Fifth
Amendment.[3]

---

[2] To the extent the facts of this case implicitly present an ancillary
question as to whether a witness must exercise the right by
requesting advice of counsel or whether an attorney may simply
interpose advice, the parties do not raise the issue.  Thus, we do not
address it.

[3] Rosenfeld also suggests that the order was unlawful under the
Sixth Amendment.  However, as the district court points out on
appeal, the United States Supreme Court clearly held in *Perry v.*
*Leeke* that the Sixth Amendment does not afford a witness a
"constitutional right to consult with his lawyer while he is
testifying."  488 U.S. 272, 281 (1989).  Still, *Perry* concerned only

## C. Rosenfeld Was Excused From Complying With the Order

¶ 35    Our conclusion as to the unlawfulness of the court's order, however, does not end our inquiry.  Simply because the district court's order was unlawful does not necessarily excuse Rosenfeld's noncompliance; a party generally must comply even with an unlawful order or risk being held in contempt.  Indeed,

> it is fundamental to our legal system that "all orders and judgments of courts must be complied with promptly.  If a person to whom a judge directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal.  Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect."

*People v. Coyle*, 654 P.2d 815, 820 (Colo. 1982) (quoting *Maness*, 419 U.S. at 458); *see also People v. Jones*, 262 P.3d 982, 987 (Colo. App. 2011) (stating in dicta that a party is "not free to disregard a ruling she th[inks] to be incorrect: her remedy [is] to appeal after judgment").  *But see* C.R.C.P. 107(a)(1) (defining contempt as

---

the reach of the Sixth Amendment's right to counsel, not the concomitant right to advice of counsel under the Fifth Amendment.  Thus, *Perry* does not affect our analysis of the lawfulness of the court's order under the Fifth Amendment.

21

including "disobedience . . . by any person to . . . any *lawful . . .* order of the court") (emphasis added); *White*, 907 P.2d at 739 ("[T]hat part of the sentencing order . . . was not a lawful order, and Adamek's violation of that order cannot support the contempt finding entered by the trial court."); *see also People v. Voth*, 2013 CO 61, ¶ 15, 312 P.3d 144, 148 ("A trial court necessarily abuses its discretion if its ruling is based on an erroneous view of the law.").[4]

¶ 36   However, in *Maness*, the Court recognized an exception to that general rule in the context of the Fifth Amendment:

> When a court during trial orders a witness to reveal information . . . [c]ompliance could cause irreparable injury because appellate courts cannot always "unring the bell" once the information has been released. Subsequent appellate vindication does not necessarily have its ordinary consequence of totally repairing the error. In those situations we have indicated the person to whom such an order is directed has an alternative:
>
> "[W]e have consistently held that the necessity for expedition in the administration of the criminal law justifies putting one who seeks to resist the production of desired information to

---

[4] Though there appears to be conflicting authority as to whether an unlawful court order can support a finding of contempt, Rosenfeld concedes the point.

> a choice between compliance with a trial court's order to produce prior to any review of that order, and resistance to that order with the concomitant possibility of an adjudication of contempt if his claims are rejected on appeal."

419 U.S. at 460 (citation omitted).

¶ 37 In other words, if an order is found to be unlawful under the Fifth Amendment, and if obedience to the order carries with it a substantial risk of irreparable harm, a party's failure to comply with the order cannot support a finding of contempt. *See In re Novak*, 932 F.2d 1397, 1401-02 (11th Cir. 1991) (the collateral bar rule ordinarily requiring compliance with an unlawful order is subject to various exceptions, including when an order "require[s] an irretrievable surrender of constitutional guarantees"); *see also In re Grand Jury Proceedings*, 601 F.2d 162, 169 (5th Cir. 1979) (contempt order reversed when it infringed on attorney-client privilege, applying *Maness* to apply to any order requiring surrender of rights or privileges that would cause irreparable injury).

¶ 38 To be sure, the case before us is factually distinguishable from *Maness*. In *Maness*, the district court erroneously determined that the attorney's client could not assert the privilege against self-

incrimination, and thus it sought to compel the production of incriminating evidence despite the client's invocation of the privilege. Here, however, the district court never suggested that Rosenfeld's client could not invoke the privilege. Indeed, the record indicates that mother successfully did so on several occasions during the competency hearing, albeit on Rosenfeld's cue. However, in our view, the risk of irreparable harm to mother was nonetheless substantial enough to implicate the exception outlined in *Maness*.

¶ 39    At the outset of the hearing, the People indicated that they intended to inquire into mother's pending criminal charges. Though we question the relevance of such an inquiry to mother's competency, the People nonetheless directly questioned mother about the underlying facts of the pending charges, putting her at risk of incriminating herself.

¶ 40    The district court posits, however, that any incriminating testimony given by mother would be inadmissible in a later criminal prosecution under section 19-3-207, C.R.S. 2020, a statute intended to limit the admissibility of certain evidence that was "derived directly from testimony obtained pursuant to compulsory process in a proceeding under [article 3 of title 19]." § 19-3-207(1).

Specifically, the district court directs us to section 19-3-207(3), which provides that "[n]o admission made by a respondent in open court or by written pleading filed with the court to a petition in dependency or neglect may be used against him or her in any criminal prosecution, except for purposes of impeachment or rebuttal." However, in *People v. Stroud*, 2014 COA 58, ¶ 28, 356 P.3d 903, 909, a division of this court expressly rejected the district court's position.

¶ 41 In *Stroud*, the division examined the scope of section 19-3-207(3) and concluded that the term "admission" as used in the provision "only refers to a parent's formal admission or denial of the allegations in a petition." *Stroud*, ¶ 27, 356 P.3d at 909. Therefore, it reasoned, section 19-3-207(3) does not preclude a trial court "in a subsequent criminal case" from "admit[ting] statements — i.e., testimony — made during a contested dependency and neglect adjudicatory or termination of parental rights hearing." *Stroud*, ¶ 28, 356 P.3d at 909. And in any event, even under the district court's interpretation of section 19-3-207(3), mother's testimony

could have been used against her in her criminal trial for purposes of impeachment or rebuttal. *See* § 19-3-207(3).[5]

¶ 42     Thus, contrary to the district court's position, no state statute or rule guarantees a privilege or assures that mother's testimony at the hearing would be inadmissible in a later criminal prosecution.

¶ 43     Moreover, compounding the risk of harm to mother was the apparent uncertainty as to her competency. In their joint motion to appoint a GAL for mother, the People and the GAL appointed to K.S-E. claimed that mother "appears confused about the proceedings, her rights, and her options. She appears unable to advocate for herself or her best interests. The [County] Caseworkers and the GAL have significant concerns about Mother's ability to comprehend these proceedings, given her current mental health status." The motion ultimately alleged that "Respondent Mother is incapable of effectively participating in an adjudication proceeding and thus in need of a fiduciary representative."

---

[5] We note that it is unclear whether section 19-3-207(3), C.R.S. 2020, applies to statements made at a *Sorensen* hearing and therefore express no opinion on the issue.

¶ 44 Given that the People had called her competency into question, there was reason to doubt whether mother would be able to effectively assert the privilege without the contemporaneous advice of counsel, even though the court had advised her of her Fifth Amendment rights. Indeed, as the *Maness* Court observed, even where a witness's competency is not in doubt, the guidance of counsel is ordinarily required to enable an individual to effectively avoid prejudice to the invocation of his or her Fifth Amendment privilege. 419 U.S. at 465-66.

¶ 45 In sum, then, there was a distinct risk that (1) any incriminating information mother offered in her testimony would later be used against her and (2) she would be unable to effectively assert her privilege against self-incrimination without the contemporaneous advice of counsel. Presented with those risks, Rosenfeld was faced with a dilemma: comply with the district court's unlawful order at the risk of mother incriminating herself or disobey the order at his own risk of a contempt citation. Rosenfeld chose the latter option, prioritizing his client's interests over his own. Ultimately, we conclude that Rosenfeld's choice was not merely principled, but legally justified. Because compliance with

27

the court's unlawful order carried a substantial risk of irreparable harm to mother, we conclude that Rosenfeld was under no duty to comply with it. *See id.* at 460. Accordingly, Rosenfeld's violation of the order could not support a finding of contempt. We therefore vacate the court's order holding Rosenfeld in contempt and its imposition of punitive sanctions. *See Jones*, 262 P.3d at 991 (vacating a contempt order is the appropriate remedy).[6]

## IV.    Conclusion

¶ 46    The order is vacated.

JUDGE FURMAN and JUDGE GOMEZ concur.

---

[6] Having vacated the court's contempt order, we need not address Rosenfeld's alternative argument that he was excused from compliance with the court's unlawful order because it was "transparently invalid," a theory rooted in federal law that has yet to be applied in Colorado. Nor must we reach his remaining contentions that there was insufficient evidence to support a contempt finding or that he was not afforded adequate due process.